UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRANDON J. RUBIO,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MASON COUNTY, et al.,<br><br>　　　　　　Defendants. | CASE NO. C23-5435JLR-SKV<br><br>ORDER |

## I.  INTRODUCTION

Before the court are: (1) a motion for summary judgment filed by Defendants Mason County, Chief Kevin Hanson, Lt. Shane Shoeneberg, Sgt. Randy Newell, Cpl. Paula Blush, and officers Angela Brown, Andrew Ostergard, and Tonia Reed (together, the "Mason County Defendants") (Mason Cnty. MSJ (Dkt. # 96)); and (2) a motion for summary judgment filed by Defendants David Guidry, Shannon Slack, Dianne Houldon, Jennifer Saucier, Bre Doe, and Julie Rice (together, the "HDS Defendants") (HDS MSJ (Dkt. # 101)).  Plaintiff Brandon Rubio has not responded to either motion for summary

ORDER - 1

judgment. (*See generally* Dkt.) The court has reviewed the motions, the submissions filed in support of the motions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS both motions.

## II.   BACKGROUND

This matter arises from Mr. Rubio's time as a pretrial detainee at the Mason County Jail ("MCJ"). On April 5, 2023, officers arrested Mr. Rubio and brought him to the MCJ for pretrial detention. (Reed Decl. (Dkt. # 98) ¶ 3.) While at the MCJ, Mr. Rubio received medical care from multiple individuals employed by Healthcare Delivery System ("HDS"), which contracts with the MCJ to provide medical services. (Slack Decl. (Dkt. # 103) ¶¶ 2-3.) Mr. Rubio was furloughed to an inpatient treatment program in May 2023, but he was arrested again on September 6, 2023 and brought back to the MCJ. (Beyer Decl. (Dkt. # 97) ¶ 2 Ex. A.) From October 11, 2023 to October 27, 2023, Mr. Rubio was housed at the Nisqually Corrections Center ("NCC"). (*Id.*) He then returned to the MCJ. (*Id.*)

On February 26, 2024, after Mr. Rubio pleaded guilty to several felonies in Mason County, the Mason County Superior Court sentenced him to confinement in the custody of the Washington Department of Corrections ("DOC"). (Beyer Decl. ¶¶ 2-4, Exs. A-C.) The DOC took custody of Mr. Rubio on February 27, 2024. (Beyer Decl. ¶ 2 Ex. A; Slack Decl. ¶ 4.)

---

[1] None of the parties requested oral argument, and the court finds that oral argument would not be helpful to its disposition of the motions. *See* Local Rules W.D. Wash. LCR 7(b)(4).

ORDER - 2

1          In May 2023, a few weeks after Mr. Rubio arrived at the MCJ, Mr. Rubio brought
2  a bevy of claims against the Mason County Defendants and the HDS Defendants,
3  alleging violations of his constitutional rights.  (Compl. (Dkt. # 1-1) at 10-18.)  Later that
4  year, shortly after he was housed at the NCC, Mr. Rubio amended his complaint to add
5  additional allegations and counts and to add two defendants associated with the NCC.[2]
6  (Am. Compl. (Dkt. # 20) at 6-26.)  As amended, Mr. Rubio's complaint comprises ten
7  counts, alleging violations of the First, Fifth, Eighth, Thirteenth, and Fourteenth
8  Amendments, and includes requests for injunctive and monetary relief.  (*Id.* at 6-27.)
9  Specifically, Mr. Rubio alleges that Defendants failed to give him the medications and
10 medical treatment that he needed at the MCJ (Am. Compl. Counts 1, 3, 5, 7); assigned
11 him a top bunk bed at the MCJ when he was medically required to have a bottom bunk
12 (*id.* Count 2); failed to give him the medications he needed at the NCC (*id.* Count 5);
13 failed to provide him with a television at the MCJ (*id.* Count 6); failed to provide him
14 with a writing instrument in his cell and with access to the law library at the MCJ (*id.*
15 Count 8); segregated him from inmates and other detainees at the MCJ as retaliation for
16 filing grievances and lawsuits (*id.* Count 9); and assigned him minor infractions at the
17 MCJ without due process (*id.* Count 10).
18         From there, various motions narrowed the case.  First, the court dismissed all
19 counts against the Mason County Defendants except Counts 2, 8, 9, and 10, which

---

[2] These defendants were Cpl. Freeman and an individual identified only as "Nurse Lisa." (12/27/24 Ord. (Dkt. # 108) at 4-5.)  The new allegations concerning the NCC did not name the HDS Defendants, and HDS does not contract with NCC or provide any medical services at that facility.  (*See* Am. Compl.; Slack Decl. ¶ 5.)

ORDER - 3

concern Mr. Rubio's bunk assignment, law library and writing instrument access, segregation from other detainees and inmates, and minor infractions.  (6/10/24 Ord. (Dkt. # 73) at 2.)  Second, the court dismissed all counts as to the two defendants associated with the NCC.  (12/27/24 Ord. (Dkt. # 108) at 4-5.)  The motions for summary judgment filed by the Mason County Defendants and the HDS Defendants encompass all the remaining counts and defendants in this action.

## III. DISCUSSION

The court first discusses the applicable standard of review for summary judgment motions, and then addresses each of Mr. Rubio's claims in turn.

### A. Standard of Review

The court must grant a motion for summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015).  A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the movant meets this burden, the nonmoving party must identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Anderson*, 477 U.S. at 250.  Where, as here, the nonmoving party does not respond or otherwise "fails to properly support an assertion of fact or [] to properly address another party's

1  assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the
2  motion." Fed. R. Civ. P. 56(e)(2); *see also Heinemann v. Satterberg*, 731 F.3d 914, 917
3  (9th Cir. 2013) ("If there is a failure to respond, [Rule 56] authorizes the court to consider
4  a fact as undisputed.") (cleaned up).  Nevertheless, the court must still assess whether the
5  motion and supporting materials entitle the movant to summary judgment.  *Heinemann*,
6  731 F.3d at 917; *see also* Local Rules W.D. Wash. LCR 7(b)(2) ("Except for motions for
7  summary judgment, if a party fails to file papers in opposition to a motion, such failure
8  may be considered by the court as an admission that the motion has merit.").

**B.    Mr. Rubio's Claims of Deliberate Indifference to His Medical Needs**

In Counts 1, 2, 3, 4, and 7, Mr. Rubio contends that Defendants violated his constitutional rights at the MCJ through deliberate indifference to his serious medical needs.[3]  (Am Compl. at 7-16.)  He claims that before he was booked into the MCJ in April 2023, he had been taking Bupropion, Trazadone, Gabapentin, MiraLAX, Senecot, Zyprexa, Suboxone, and pain medication to treat several different medical conditions, to manage his pain, and to treat his opiate addiction.  (*Id.*)  He asserts that Defendants discontinued all these medications, which caused him severe withdrawal symptoms and left him without adequate care for his medical conditions and pain.  (*Id.*)  He also asserts that Defendants refused to provide him with necessary dental care unless he agreed to have his teeth pulled (*id.* at 20-22), and that Defendants refused to provide him with a

---

[3] Mr. Rubio names a different set of defendants for several of these counts.  (*See* Am. Compl. at 7-16.)  For simplicity, and because the analysis does not differ as to any individual defendant, the court refers broadly to Defendants, the Mason County Defendants, and the HDS Defendants (as appropriate) in analyzing Mr. Rubio's claims.

bottom bunk bed despite his history of seizures, which caused him harm when he fell from his assigned top bunk (*id.* at 11-12. Additionally, in Count 5, Mr. Rubio alleges deliberate indifference to his serious medical needs while he was at the NCC. (*Id.* at 17-18.)

When a pretrial detainee alleges that he or she received inadequate medical care, the claim arises under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). The court evaluates such claims using an objective deliberate indifference standard. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). To prevail, a detainee must show that the defendant: (1) made an intentional decision concerning the conditions under which the plaintiff was confined; (2) put the plaintiff at substantial risk of suffering serious harm as a result; (3) did not take reasonable, available measures to abate the risk, even though a reasonable official would have appreciated the high degree of risk involved; and (4) by not taking such measures, caused the plaintiff's injuries. *Id.* at 1125. The defendant must have acted objectively unreasonably in the circumstances and with a state of mind "akin to reckless disregard"— mere negligence and a simple lack of due care do not violate the Fourteenth Amendment. *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). Additionally, if the plaintiff's harm is an "isolated exception to the . . . overall treatment of the prisoner[,] it ordinarily militates against a finding of deliberate indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (cleaned up).

Because the court has already dismissed Counts 1, 3, 4, 5, and 7 as to the Mason County Defendants (6/10/24 Ord.), it assesses these counts only as to the HDS

Defendants. As to Count 5, there is no evidence that the HDS Defendants were involved in providing medical care at the NCC. To the contrary, the evidence shows that HDS does not contract with the NCC to provide medical services, and it has no connection to the medical staff or services provided at the NCC. (Slack Decl. ¶ 5.) No reasonable jury could find that the HDS Defendants were responsible for deliberate indifference to Mr. Rubio's serious medical needs at the NCC.

As to Counts 1, 3, 4, and 7, there is no evidence that the HDS Defendants refused to provide Mr. Rubio with necessary medications, medical care, or dental care at the MCJ. Indeed, the evidence shows that, while Mr. Rubio was on pretrial detention at the MCJ, the HDS Defendants gave him appropriate prescription medications for his health conditions. (*Id.* ¶ 4.) The HDS Defendants indicated that voluminous records of Mr. Rubio's health conditions and treatments received at the MCJ—comprising over 130 pages—were available upon request. (*Id.* ¶ 4.) However, Mr. Rubio did not ask that the HDS Defendants submit his medical records to the court, nor did he cite anything in those records that would suggest that he was given inadequate care or medication at the MCJ.[4] (*See generally* Dkt.)

Finally, Count 2 concerns both the HDS Defendants and the Mason County Defendants. (Am. Compl. at 11-12.) As to this count, there is no evidence that Defendants were deliberately indifferent to Mr. Rubio's serious medical needs in

---

[4] In a declaration, Mr. Rubio stated that his medical records reflected a prescription for Bupropion, but he did not state that his records showed that the HDS Defendants stopped this medication or otherwise failed to provide appropriate medications. (4/17/24 Rubio Decl. (Dkt. # 60) at 2.)

assigning him a top bunk. Mr. Rubio only alleges a single instance of falling from his top bunk, and he admits that the Mason County Defendants moved him to a bottom bunk two days after his fall.[5] (*Id.*) The only evidence in the record shows that when Mr. Rubio received his top bunk assignment, he had no medical documentation of a bottom bunk requirement and no bottom bunks were available. (Reed Decl. ¶¶ 4-5.) Additionally, the Mason County Defendants transferred Mr. Rubio to a bottom bunk as soon as one became available. (*Id.* ¶ 5.) Even though Mr. Rubio claimed upon arriving at the MCJ that he needed a bottom bunk for medical reasons (*id.* ¶ 3), Defendants were not required to immediately clear a bottom bunk for Mr. Rubio by reassigning its current occupant, based upon Mr. Rubio's claims alone. *See Goodall v. Jacobson*, No. CV-08-5023-CI, 2010 WL 889965, at *6 (E.D. Wash. Mar. 8, 2010) (concluding that a single fall from a top bunk was an isolated incident and that prison officials were not required to assign an inmate to a bottom bunk before confirming claims of seizure history in the inmate's medical records). Mr. Rubio does not allege, and no evidence shows, that he suffered a subsequent fall after he informed MCJ staff that he had fallen from his bunk and sustained injuries. Based upon the foregoing and the lack of any documented medical requirement for a bottom bunk, no reasonable jury could find that Defendants were deliberately indifferent to Mr. Rubio's serious medical needs in assigning him a top bunk in these circumstances.

---

[5] In his amended complaint, Mr. Rubio claimed that this fall was serious and caused him "compressed and herniated dis[c]s, 3-4 days of whiplash and weeks of serious pain." (Am. Compl. at 12.) However, in a later declaration, he admitted that his medical records only reflected "a bruise from the fall[.]" (4/17/24 Rubio Decl. at 2.)

C.  **Mr. Rubio's Access to Television**

In Count 6, Mr. Rubio alleges that although the MCJ previously provided televisions for inmates and pretrial detainees, two of the Mason County Defendants, Chief Hanson and Lt. Shoeneberg, removed the televisions and refused to reinstall them to punish all inmates and detainees. (Am. Compl. at 19-20.) He claims that this violated his constitutional rights by effectively denying him access to outside news and other information. (*Id.*)

Although inmates and detainees have a First Amendment right, subject to reasonable limitations, to receive published materials, *see Pell v. Procunier*, 417 U.S. 817, 822-28 (1974), a prison's decision to deny television access does not rise to the level of a constitutional violation. *See Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996) (listing items that prisons must provide to pretrial detainees, without including television access); *Murphy v. Walker*, 51 F.3d 714, 718, n.8 (8th Cir. 1995) (per curiam) (noting that denying television access is not a constitutional violation). Thus, as a matter of law, Mr. Rubio did not suffer a constitutional violation when Chief Hanson and Lt. Shoeneberg denied him access to television.

Separately, the court has already dismissed Count 6 as to the Mason County Defendants (6/10/24 Ord.), and there is no evidence in the record—nor any allegation from Mr. Rubio—that any of the HDS Defendants were involved in restricting Mr. Rubio's access to television. (*See* Am. Compl. at 19-20.) The evidence only shows that

the HDS Defendants staffed the MCJ's medical department and provided medical care to inmates and detainees.[6] (Slack Decl. ¶¶ 3-4.)

### D. Mr. Rubio's Access to the Courts

In Count 8, Mr. Rubio alleges that several of the Mason County Defendants denied him access to the courts by restricting his access to the MCJ's law library and refusing to allow him to keep a pen in his cell.[7] (Am. Compl. at 23-24.) He also alleges that the Mason County Defendants afforded him only "a few minutes at best" in the law library and did not allow him to use a computer until the late evening when he was "tired and sleepy." (*Id.* at 23.)

Inmates and pretrial detainees enjoy a fundamental constitutional right of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996) (citing *Bounds v. Smith*, 430 U.S. 817, 817, 821, 828 (1977)); *see also Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995) (noting that prisoners enjoy a First Amendment right to pursue civil rights litigation in the courts). However, there is no "abstract, freestanding right to a law library or legal assistance"; there is only a right to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (cleaned up). As such, the Constitution does not require unlimited access to law libraries, and officials

---

[6] Mr. Rubio did not name any of the HDS Defendants in Counts 6, 8, 9, and 10. (Am. Compl. at 19-26.) Nevertheless, the HDS Defendants moved for summary judgment on these counts. (*See* HDS MSJ at 16-17.) The evidence shows only that the HDS Defendants were not involved in any of the allegations in any of these counts, and Mr. Rubio does not allege that they were. Thus, the court does not further analyze these counts as to the HDS Defendants.

[7] Mr. Rubio names Chief Hanson, Lt. Shoeneberg, Sgt. Newell, Cpl. Blush, and Officer Brown for Count 8. (Am. Compl. at 23.)

1  at prison and detention facilities that provide law libraries may regulate the "time,

2  manner, and place" in which library facilities are used, so long as the regulations allow

3  for reasonable access.  *See Lindquist v. Idaho State Bd. of Corr.*, 776 F.2d 851, 858 (9th

4  Cir. 1985); *see also Lewis*, 518 U.S. at 351 (reaffirming that "meaningful access to the

5  courts is the touchstone") (cleaned up); *Hebbe v. Pliler*, 627 F.3d 338, 344 (9th Cir.

6  2010) (concluding that forcing a prisoner to choose between exercising and accessing the

7  courts violates the Constitution).  To show a constitutional violation, a plaintiff must do

8  more than show some theoretical shortcoming in a facility's law library or legal

9  assistance program:  the plaintiff must "demonstrate that the alleged

10 shortcomings . . . hindered his efforts to pursue" a non-frivolous legal claim.  *See Nasby

11 v. Nevada*, 79 F.4th 1052, 1056 (9th Cir. 2023) (quotations omitted).

       Here, there is no evidence in the record showing that any of the Mason County

13 Defendants unconstitutionally hindered Mr. Rubio's access to the courts.  The evidence

14 shows only that Mr. Rubio visited the MCJ's law library 38 times after he was arrested in

15 April 2023 and that—each time—he was allowed to stay until he was ready to leave.

16 (Zaniewski Decl. (Dkt. # 99 ¶ 2).)  There is no direct evidence in the record concerning

17 Mr. Rubio's access to a pen, but even assuming the truth of his allegations that he was

18 not allowed to keep a pen in his cell, the Constitution does not require access to a writing

19 instrument every minute of every day—it requires only a reasonably adequate

20 opportunity to present claimed constitutional violations to the courts.  Furthermore, Mr.

21 Rubio's conduct in this litigation shows that he had reasonable access to writing

22 instruments at the MCJ.  From the outset of this case until February 2024 (when Mr.

Rubio left the MCJ to serve his sentence), Mr. Rubio was an active and attentive litigant: among other things, he applied for *in forma pauperis* status (Application (Dkt. # 1)), drafted and filed his complaint (Compl.), amended his complaint (Am. Compl.), wrote multiple letters to the court (Dkt. ## 16, 23), filed several motions (Dkt. ## 24, 27, 29, 35, 37), filed a declaration (1/19/24 Rubio Decl. (Dkt. # 40)), and objected to a report and recommendation issued by Magistrate Judge Vaughan (Obj. (Dkt. # 14)).  Mr. Rubio handwrote all these submissions using a pen, and there is no evidence that Mr. Rubio failed to provide any required filings or was unable to prepare and file a document that he wished to file while he was detained at the MCJ.[8]

### E. Mr. Rubio's Minor Infractions and Placement in Segregation

In Counts 9 and 10, Mr. Rubio alleges that several of the Mason County Defendants violated his constitutional rights by assigning him minor infractions without due process and by keeping him segregated from inmates and other detainees as retaliation for his lawsuit, his use of the MCJ's grievance process, and his activities as a "jailhouse lawyer[.]"[9]  (Am. Compl. 25-26.)  However, the court agrees with the Mason

---

[8] Of course, Mr. Rubio did not respond to the summary judgment motions filed by the Mason County Defendants and by the HDS Defendants (*see generally* Dkt.), but this does not show that the MCJ Defendants interfered with Mr. Rubio's access to the courts.  Both motions were filed in November 2024—long after Mr. Rubio left the MCJ to serve his sentence. (*See* Mason Cnty. MSJ; HDS MSJ; Not. of Change of Address; Beyer Decl. (Dkt. # 97) ¶ 3, Ex. B.)  By comparison, the high volume of Mr. Rubio's handwritten filings while he was detained at the MCJ shows only that the Mason County Defendants provided him with reasonable access to writing implements.

[9] Mr. Rubio names Chief Hanson, Lt. Shoeneberg, Sgt. Newell, and officers Brown and Ostergard for Count 9, and names Chief Hanson, Sgt. Newell, and Officer Reed for Count 10. (Am. Compl. at 24, 26.)

1  County Defendants that the Prison Litigation Reform Act ("PLRA") bars Mr. Rubio's
2  ability to challenge his minor infractions because he did not use the MCJ's available
3  grievance procedures to contest those infractions, and that the record contains no
4  evidence of retaliation. (*See* Mason Cnty. MSJ at 11-15.)
5      The PLRA requires those confined "in any jail, prison, or other correctional
6  facility" to exhaust all "available" administrative remedies before bringing a lawsuit
7  concerning the conditions of the facility in which they are incarcerated or detained. *See*
8  42 U.S.C. § 1997e(a), (e). Thus, if a detainee fails to use an available administrative
9  remedy, like a grievance process, to contest his or her treatment in jail, the detainee
10 cannot later sue based upon that treatment. *See Ross v. Blake*, 578 U.S. 632, 638-39
11 (2016). However, a detainee need only exhaust "available" administrative remedies—
12 there is no need to use an administrative process that operates as a simple dead end or
13 that is too confusing for a reasonable prisoner to navigate. *Id.* at 644. Likewise,
14 detainees need not attempt to navigate an administrative process when prison
15 administrators make the process practically unusable, such as by thwarting inmates
16 "through machination, misrepresentation, or intimidation" or by "devis[ing] procedural
17 systems . . . to trip up all but the most skillful prisoners." *See id.* at 644.
18     When a detainee attempts to use an available grievance process or other
19 administrative procedure, files a civil rights action, or engages in other constitutionally-
20 protected conduct, the First Amendment prevents prison officials from retaliating. *See*
21 *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). A retaliation claim comprises the
22 following elements: "(1) An assertion that a state actor took some adverse action against

an inmate (2) because of (3) that [inmate's] protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021) (quoting *Rhodes*, 408 F.3d at 567-68). To raise a triable issue as to motive, a plaintiff must offer either direct evidence of a retaliatory motive or circumstantial evidence, including (1) proximity in time between the protected activity and alleged retaliation, (2) remarks by the defendant expressing opposition to the activity, or (3) other evidence that the defendant's proffered reasons were pretextual. *See McCollum v. Cal. Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011).

   Here, the record shows that the MCJ had a grievance procedure that allowed inmates and detainees to contest minor infractions by filing a grievance within 24 hours of receiving an infraction. (Zaniewski Decl. ¶¶ 3-4.) Mr. Rubio received three minor infractions while he was at the MCJ, but he did not file any grievances within 24 hours of receiving any of the infractions. (*Id.*) Mr. Rubio was aware of the MCJ's grievance procedures and the 24-hour time limit because he used the grievance system over 100 times while he was at the MCJ. (*Id.* ¶ 4.) Additionally, there is no evidence—or even an allegation—that anyone attempted to prevent Mr. Rubio from using the MCJ's grievance process or that the procedures were too difficult for a reasonable prisoner to navigate. To the contrary, Mr. Rubio used the grievance procedures at the MCJ on numerous other occasions. (*Id.* ¶ 4.) Thus, the PLRA bars Mr. Rubio from challenging his minor infractions in this action.

As to Mr. Rubio's retaliation claims, there is no evidence in the record—direct or circumstantial—that the Mason County Defendants took any adverse action toward Mr. Rubio because he used the MCJ's grievance process, because he filed suit against the Mason County Defendants, or because he took some other protected action. Indeed, there is no information in the record about when Defendants allegedly retaliated against Mr. Rubio, so there is not even circumstantial evidence of retaliation based upon the timing of Defendants' acts and Mr. Rubio's constitutionally-protected conduct. Accordingly, Defendants are entitled to summary judgment on these claims as well.[10]

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS the Mason County Defendants' motion for summary judgment (Dkt. # 96) as to all Mr. Rubio's remaining claims and GRANTS the HDS Defendants' motion for summary judgment (Dkt. # 101) as to all Mr. Rubio's claims.

Dated this 29th day of January, 2025.

JAMES L. ROBART
United States District Judge

---

[10] Because the court concludes that there is no evidence that Mr. Rubio suffered a violation of any constitutional right, the court does not reach Defendants' alternative arguments, including the Mason County Defendants' qualified immunity arguments and their argument that the PLRA bars Mr. Rubio's ability to challenge his minor infractions because he only alleges harm to his mental health. (*See generally* Mason Cnty. MSJ; HDS MSJ.)

ORDER - 15